[Civ. No. 10135. Fourth Dist., Div. One. May 20, 1970.]

FLOYD WILSON CURRY, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[Civ. No. 10145. Fourth Dist., Div. One. May 20, 1970.]

ROLAND JACK HENDERSON et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

(Consolidated Cases.)

## Counsel

Percy Foreman, James W. Tetley and James P. McGowan, Jr., for Petitioners.

James Don Keller, District Attorney, Richard H. Bein and Terry J. Knoepp, Deputy District Attorneys, for Respondent and for Real Party in Interest.

## Opinion

WHELAN, J.—Roland Jack Henderson (Henderson) and Linda Gail Henderson (Mrs. Henderson)[1] moved under section 1538.5, Penal Code, to suppress certain physical evidence. Floyd Wilson Curry (Curry), a codefendant in the same criminal action, made a like motion. Both motions were denied in part.

The petitions for writs of prohibition have been consolidated for hearing and decision. The petitioners rely upon the transcript of the oral proceedings on the hearing of the motions to suppress and on the transcript of the grand jury hearing which resulted in the indictment of defendants for burglary and for conspiracy to commit burglary.

At about 6:25 a.m. of September 23, 1969, Katherine Martin, through the window of her house on Poe Street, as she watched her husband being driven to work, saw another car come onto Poe Street and to the end of the block, a cul-de-sac into which the car was backed; a man alighted from the driver's side and, shortly, walked down Poe Street on the Martin side of the street, then around to the other side and went toward the house of Frank Medina. Mrs. Martin knew the Medina family was out of town and expected the man would find no one at home and leave. Instead, the man, after a few minutes, came back to the sidewalk, looked toward the car, nodded his head, and made a gesture with his arm. In Mrs. Martin's first observation she had seen only the first man in the car; now she saw a second man get out of the car on the right side, remove a suitcase from the trunk of the car and join the first man, with whom he walked onto the porch of the Medina house; a few minutes later Mrs. Martin saw some movement of the front screen door, concluded the men had entered the house, and telephoned the police, giving that information.

Police Officer Buckeye arrived at the Medina house with a second officer at about 6:40 a.m. While his companion covered the front door, he went to the back door of the house, where he heard the sound of someone inside approaching. He drew his service pistol and covered Henderson and Curry as they came out. Henderson wore gloves which he was removing as he emerged. The second officer joined Buckeye and the two men were searched.

Henderson carried a Browning automatic pistol inside the waistband of his trousers, containing a fully-loaded clip of ammunition, the chamber being empty; he had in his wallet two one-hundred-dollar bills and one fifty-dollar bill, and in a gold money clip an additional $652. The outer edges of several of the twenty-dollar bills had marks of burning.

---

[1]Henderson and Mrs. Henderson also were known by the name of Ramsey.

The search of Curry discovered a silver clip holding $251, a wallet containing a thousand-dollar bill, a Samsonite luggage key, and a pair of gloves. The thousand-dollar bill was partially burned; other bills in the clip were either burned or scorched.

Neither man had a car key on his person.

Shortly after 7:30 a.m. Officer Tague, assigned to the burglary detail, arrived at the Medina residence. He heard from Buckeye and his companion a report of their activities and of what they had found.

Tague talked with Mrs. Martin also, who told him what she had seen. Next he went inside the house and there saw in one of the rooms a closet, the door of which had apparently been forced open; on the floor of the room was a suitcase with several pry tools; inside the suitcase were an acetylene bottle, an oxygen bottle, cutting torches, pry tools, a striker or igniter for the torches, and a sledge hammer.

Also in the house, near the back door under a throw rug, was a floor safe with a tag carrying the name Western Safe and Vault Company and a telephone number.

Tague observed pry marks on the window frame of a sliding glass window next to the front door, the screen of which had been removed.

Tague then called his superior at the police station and reported what he had seen and heard. The superior then gave him the following information: The San Diego Police Department had received a teletype message from Detective Walt Smith, of the Phoenix, Arizona Police Department that there had been a safe burglary in Phoenix on September 17 in which had been stolen a thousand-dollar bill and about $4,000 in twenty-dollar bills, as well as some jewelry; that the money probably was charred because the safe had been burned open; that three suspects had been seen leaving the scene of the burglary.

Tague also was informed that Detective Walt Smith of Phoenix had by telephone informed Detective Manuel Smith of San Diego that the Star Safe Company of Phoenix had been burglarized in 1967 and its records removed; and that thereafter there had been a series of safe burglaries in Phoenix.

Tague already was aware of a burglary at Western Safe and Vault Company of San Diego on September 1 when the company's records had been stolen.

Tague then (at about 8:15 a.m.) went to the parked automobile, a blue Plymouth, not more than 200 feet from the Medina house, entered it, and

opened the glove compartment, in which he found the keys to the ignition and trunk, a key to room 115 of King's Inn, a motel about four miles distant, and a receipt of payment of hire for the car from "Jimsair," a company located at the San Diego Airport. Tague took possession of all those articles. The receipt indicated the car had been rented on September 20 by Floyd W. Curry.

Tague stated his motive in going into the car was to search for additional evidence bearing on the Medina burglary. On occasions when Tague had obtained warrants he had never been able to do so in less than four hours.

It was then about 9:30 a.m. Tague again called the police station, reported what he had found, and requested that room 115 at King's Inn be kept under surveillance. He also called Jimsair and was informed the hirer of the car had an aircraft at the airport.[2] He then proceeded to King's Inn, arriving shortly before 10 a.m.

He learned from the manager of King's Inn that room 115 had been rented on September 20 by James Reger of Dallas, Texas, with occupancy to terminate on September 24; on September 22 room 122 had been rented by Reger with occupancy to terminate September 23.

Tague found two police officers, including Officer Osborn, stationed outside room 122, which had a large window, mostly uncurtained. Osborn and his companion officer had received orders at about 9:30 a.m. to go to King's Inn. Looking through the window, Tague saw nobody, but heard and saw that a television set was in operation. He knocked at the door, and through the window alongside saw a woman come from a partitioned-off section at the rear. She opened the door and Tague identified himself as a police officer, said he wished to ask her some questions and asked if he might enter. His testimony and the woman's response were: "I displayed a badge to her, the badge that I carry, and said, 'I'm a San Diego police officer. I would like to come in and talk to you.'

". . . . . . . . . . . . . . . .

"When I asked her if I could come in, she said, 'Yes, come in.' "

The woman wore a knee-length robe, below and under which were pajamas.

Inside, Tague asked the woman, who was Mrs. Henderson, if he might

---

[2]Tague's testimony before the grand jury.

see some identification. The following sequence followed: "[S]he said, 'Well, do I have to show you any identification?'

"And I told her, 'No, if you wish not to, you don't have to.'

"And then she posed the question to me, 'Well, am I under arrest?'

"And I responded to her, 'As a matter of fact, yes, you're under arrest for armed robbery and burglary.' "

Officer Osborn had entered with Tague. Tague observed a suitcase lying open on a dresser. Osborn who was nearer to it also saw the suitcase lying fully opened on the dresser, and on top of women's clothing in the suitcase, in plain view, a brown leather case for carrying a pistol, imprinted with the word "Browning" in gold lettering. Osborn picked it up and showed it to Tague, who told Osborn to look through the case for any weapon. Osborn did so and found no weapon but did find about $4,000 in partly-charred bills, and a case of jewelry.

After she had been given a *Miranda* warning by the third officer who had then come in, Mrs. Henderson asked that if she were being taken to jail she might dress. Tague asked her if she knew of any guns in the room. She said, "I don't think so. At least none that I am aware of." Tague told her that before he would allow her privacy he was going to make sure there were no arms in the room.

The officers then conducted a search of the bathroom and dressing room with closet, which was a screened-off area near the rear. An overnight bag in the closet had heavy objects in the bottom, which were removed: one was a walkie-talkie set, another a bundle of invoices from Western Safe and Vault Company, a third a radio transceiver. Tague, who in his experience had found guns in the water tanks of flush toilets, looked in the water tank and found another group of invoices from the safe company.

Later in the day another officer found a dispatch case in the room containing another pistol. The next day all luggage had been removed by the hotel management and was stored in its storeroom. There the police examined the luggage and found and impounded some jewelry, including some stolen in Phoenix.

The trial court granted the motion to suppress as to the $4,000 and other property found in the search of Mrs. Henderson's suitcase and the jewelry found in the search of luggage on the following day; denied the motion as to the motel key, the pistol case, and the material found in the search of the bathroom and dressing area.

## Petitioners' Contentions

The petitioners raise the following questions:

1. Was the search of the automobile without a warrant an unreasonable one?

2. Was admission to the motel room accomplished by means of an illegal ruse?

3. Was Mrs. Henderson's arrest made without probable cause?

4. Was the search of the bathroom and dressing area unlawful?

5. Was the seizure of Mrs. Henderson's jewelry at the time of booking at the county jail unlawful?

## The Search of the Car Was Lawful

Tague made a complete search of the car. We do not pass upon the legality of that search except as to his looking into the glove compartment.

■ The following considerations afford reasonable grounds for Tague's action in searching for the car keys and registration paper.

Henderson and Curry, by reason of the intended method of operation in the Medina house, and their possession of a charred one-thousand-dollar bill, probably are two of the three suspects in the recent Phoenix burglary; the two men had come to Poe Street in the car parked a short distance away; the keys to the car were not found in the search of the two men and probably were still in the car; if the keys were not in the car that would be a strong indication there was a third person in the area; but even if the keys were in the car, the third person in this trinity of crime might be skulking in the neighborhood; it was desirable, therefore, to discover whether the keys were in the car and if so to take them so as to immobilize the car; it was desirable also to see the registration of the car; a logical place to look for the keys and the registration information was in the glove compartment.

His stated purpose in going into the car does not make unreasonable the search that was justified under the circumstances.

The following cases are supportive of the reasonableness of the search of an unoccupied car as an incident to the contemporary arrest of the operator in the proximate vicinity of the car and of the crime for which the arrest is made: *People* v. *Williams,* 67 Cal.2d 226 [60 Cal.Rptr. 472, 430 P.2d 30]; *People* v. *Morrison,* 258 Cal.App.2d 75 [65 Cal.Rptr. 445];

*People* v. *Superior Court,* 264 Cal.App.2d 794 [70 Cal.Rptr. 795]; *People* v. *Cox,* 269 Cal.App.2d 579 [75 Cal.Rptr. 147].

In *People* v. *Smith,* 63 Cal.2d 779, 800 [48 Cal.Rptr. 382, 409 P.2d 222], the court found a warrantless search of a rented car, abandoned on the street by the hirer, to be reasonable. But our belief Tague's search in the glove compartment was reasonable, while based upon the circumstances of the burglary and arrest, is justified rather by the need to secure the keys of the car lest an attempt be made to remove it by a possible accomplice of the burglars, and, otherwise, the need for the police to remove the car from the street, knowing that the persons who had left it there were in custody, and by the reasonableness of seeking identification of the owner of the car.

*Cooper* v. *State of California,* 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788], furnishes the criteria in this situation. "We made it clear in *Preston* that whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case and pointed out, in particular, that searches of cars that are constantly movable may make the search of a car without a warrant a reasonable one although the result might be the opposite in a search of a home, a store, or other fixed piece of property. 376 U.S., at 366-367, 84 S.Ct., at 882-883.

".   .   .   .   .   .   .   .   .   .   .   .

"The question is rather whether the search was reasonable under the Fourth Amendment. . . . It is no answer to say that the police could have obtained a search warrant, for '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.' *United States* v. *Rabinowitz,* 339 U.S. 56, 66, 70 S.Ct. 430." (Pp. 790-791 [386 U.S. pp. 59-62, 17 L.Ed.2d pp. 732-734].)

In *People* v. *Grubb,* 63 Cal.2d 614, 618 [47 Cal.Rptr. 772, 408 P.2d 100], the court dealt with the right to search in a car for evidence of registration, and by implication extended to peace officers other than members of the highway patrol the authority conferred by section 2805,[3] Vehicle Code. There the court said: "As to defendant's claim of an alleged unlawful police entry of the vehicle, we point out that we have recognized that officers need not invariably and under every circumstance obtain a search warrant to enter an automobile. [Citation.] We have upheld an entry with-

---

[3]Vehicle Code section 2805 provides: "A member of the California Highway Patrol may inspect any vehicle of a type required to be registered under this code on a highway or in any public garage, repair shop, parking lot, used car lot, or other similar establishment, for the purpose of locating stolen vehicles or investigating the title and registration thereof."

out a warrant if 'compelling reasons and exceptional circumstances' justify it. [Citation.] Although the justification for a search without a warrant usually lies in its incidence and relationship to a lawful arrest [citations], here we find the warrantless entry sustained by extraordinary and exceptional circumstances."

We make no strained effort to bring the instant case within the factual framework of *Cooper* or *Grubb*. We find it wholly reasonable that the police should take possession of the keys of the car in which they had been left under the circumstances here related, and equally reasonable that they should seek evidence of registration of the vehicle. Perhaps a warrant might have been obtained for the keys as having been "used as the means of committing a felony." (Pen. Code, § 1524, subd. 2.) Evidence of registration except in the case of a vehicle reasonably believed to have been stolen may not so easily come within the provisions of that section.

■ The discovery of the motel key was incidental to the search for the car keys and registration. It was not in itself evidence of a new crime and was relevant to further investigation of that for which Henderson and Curry were arrested. The police were not required to overlook what was clearly visible and the observation of which was not the result of illegal police activity. (*People* v. *Roberts,* 47 Cal.2d 374, 380 [303 P.2d 721]; *People* v. *Jolke,* 242 Cal.App.2d 132, 148 [51 Cal.Rptr. 171].)

### Admission Into the Motel Room Was Not Illegal

Petitioners argue Tague employed a dishonest practice when he told Mrs. Henderson he wished to question her, since his secret intention was to place her under arrest. ■ If no probable cause for arrest is possessed by the police, but is discovered after the opening of a door resulting from the use of misrepresentation, the arrest is unlawful and a legal search may not be predicated upon it. (*People* v. *Reeves,* 61 Cal.2d 268 [38 Cal.Rptr. 1, 391 P.2d 393].)

■ In the present case the door was opened before Teague had said anything. It was not opened as the result of a ruse, dishonest or otherwise.

Teague's conduct thereafter was straightforward. He did not seek to conceal his identity. Mrs. Henderson, who testified in the hearing, made no claim she had been deceived or did not freely and voluntarily permit Tague's entry. Whether defendant opened the door as the result of a misrepresentation or ruse by the police is relevant only if Tague lacked probable cause to arrest. (*People* v. *Lawrence,* 149 Cal.App.2d 435, 444 [308 P.2d 821]; *People* v. *Scott,* 170 Cal.App.2d 446, 452 [339 P.2d

162]; *Leahy* v. *United States,* 272 F.2d 487; *Dickey* v. *United States,* 332 F.2d 773.)

### THERE WAS PROBABLE CAUSE FOR THE ARREST OF MRS. HENDERSON

That which hinges upon whether there was probable cause to arrest Mrs. Henderson is the legality of the search for weapons in the bathroom and the dressing area. The legality of the taking of jewelry from her person at the jail also must depend upon it.

■ Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. ■ Probable cause has also been defined as having more evidence for than against, supported by evidence which inclines the mind to believe but leaves some room for doubt. It is not limited to evidence that would be admissible at the trial on the issue of guilt. The test is not whether the evidence upon which the officer acts in making the arrest is sufficient to convict but only whether the person should stand trial. (*People* v. *Ingle,* 53 Cal.2d 407, 412-413 [2 Cal.Rptr. 14, 348 P.2d 577].)

In passing upon the question of probable cause for arrest, therefore, the trial judge assumes the agreeable *persona ficta* of the reasonable man and in that guise looks at the conduct of the police as in a speculum to see whether his image is mirrored therein, illumined by the reliable information possessed by the police.

■ The information possessed by Tague has been detailed earlier. In addition to that part of it that made it reasonable to search in the glove compartment of the car, the following matters furnished material upon which the reasonable mind might operate.

Having found the keys and the rental receipt, and having seen the motel room key, the information obtained therefrom was not to be disregarded; one of the persons involved in the burglaries had rented the car at the San Diego airport; he had an aircraft there; they were not limited by state lines and used modern means of travel, so surveillance at the motel should be effected; while the third suspect might be in the Poe Street neighborhood, he might also be at the motel or return there; it was not too farfetched to suspect there might be a connection between the burglary of the safe company in Phoenix and of the safe company in San Diego, and the succeeding safe robberies; the criminals were not only highly mobile, but resourceful; immediate action would be necessary if another member of the gang were to be apprehended; discovery at the motel of the two rooms, one of which was to be vacated that same day, and of the discrepancy

between the name given in registering and the name on the car rental receipt, which added a suspicious circumstance, emphasized the urgency of the situation; to discover who might be in either of the rooms seemed a matter of course; and, having been admitted to the motel room by Mrs. Henderson voluntarily, it was a matter of course to inquire as to her identity; the strong suspicion reasonably founded that the occupant of the room was a part of the conspiracy in well-organized crime was substantiated further by observation of the case for a Browning pistol lying on a heap of woman's clothing in an open suitcase in plain view.

Applying the principles stated in *People* v. *Ingle, supra,* 53 Cal.2d 407, Tague's information must have given rise to reasonably strong suspicion that the woman in the motel room was the third member of the gang. While she was under no compulsion to give her name, the manner in which she treated the request was not such as to lessen suspicion.[4]

As was said in *People* v. *Ingle, supra,* 53 Cal.2d 407, 414: "The trial court found that there was reasonable cause for the arrest, that is, that there was probable cause. Unless it can be said that prudent men in the position of these officers knowing what they knew and seeing what they did would not have had reasonable cause to believe and to concientiously entertain a strong suspicion that Ingle was violating or had violated the law, the arrest should be held lawful."

Although Tague's statement that Mrs. Henderson was under arrest preceded the observation of the Browning pistol carrying case, that discovery may be considered as giving additional reason for strong suspicion that she was a member of the conspiracy. Tague's viewing of the case was not the result of an illegal entry or of a search, so that further circumstances, if there were not probable cause without it, would have added weight to the balance of the probability of her involvement. The search was only made thereafter.

The information concerning other crimes which Henderson and Curry reasonably might be suspected of having committed would play a part in Tague's reasoning process, just as evidence of such crimes and circumstantial evidence of the two men's probable connection with them could be used as evidence of a continuing conspiracy. (*People* v. *Lopez,* 60 Cal.2d 223, 236-237 [32 Cal.Rptr. 424, 384 P.2d 16]; *People* v. *Sampsell,* 104 Cal.App. 431, 438 [286 P. 434].)

■ Active participation by Mrs. Henderson in the Medina burglary was not required in order to establish probable cause for her arrest as a

---

[4]She did later furnish identification in which the name of Henderson did not appear.

member of a conspiracy to commit such burglaries, since such active participation in the substantive crime is not required for conviction in a conspiracy charge. (*People* v. *McCarthy*, 45 Cal.App.2d 278, 282 [114 P.2d 24].)

### THE SEARCH OF THE BATHROOM AND DRESSING AREA WAS A REASONABLE ONE

The limitations on search incident to arrest have been recently restated by the United States Supreme Court in *Chimel* v. *State of California*, 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], an opinion which specifies the areas to which such a search may extend: "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary item must, of course, be governed by a like rule. A gun on the table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."

The reason stated by Tague for the search was to insure there was no weapon to which Mrs. Henderson might have access when she had control of the area while changing her clothes outside the officers' field of sight. In that respect it was a reasonable search. But *Chimel* permits the search to be not only for weapons but for destructible evidence. It would have been reasonable for Tague to suspect there might be such evidence also to which Mrs. Henderson was about to be given unviewed access.

Petitioners' argument on the subject is stated thus: "The police officers gave the petitioner a choice after her arrest: she could either go to the police department in her bedclothes or the officers could search the area in which she was to dress before she dressed. By this 'offer,' the police officers by their own actions bootstrapped their way into a search of areas which they would otherwise quite obviously have no lawful right to search under the rule as set down in *Chimel* v. *California, supra*. If such increased scope of search is allowed, officers may extend the area of their search with

ease simply by waiting until occupants of homes and motels are undressed or in bed prior to making an arrest and then give the lightly garbed occupant the choice of going to jail in their exposed condition or giving up their right of privacy in the areas which they must use to dress."

A determined effort was made in the cross-examination of Tague to suggest Mrs. Henderson's clothing was in disarray when he called. She, as a witness, made no such claim. The evidence is that she was presentably attired, and did not seem embarrassed by her dress. The officers did not time their call to find her in what counsel calls her bedclothes; it was about 10:30 in the morning. The request to change her clothes was made by Mrs. Henderson; after she was told the condition under which she might do so, she did not change her mind on the subject.

Such a search in the presence of the defendant as may be made as an incident to arrest under *Chimel* v. *State of California, supra,* may be made when probable cause for arrest exists whether the contemporary arrest has yet been made or not.

So long as an arrest that follows a search is not sought to be justified by what the search discovers, but rests upon probable cause independent of the search, a search made at the time and place of arrest may precede the arrest. (*People* v. *Boyles,* 45 Cal.2d 652, 655 [290 P.2d 535]; *People* v. *Martin,* 45 Cal.2d 755 [290 P.2d 855].) Here, probable cause to arrest existed when the search for weapons was made in the area over which Mrs. Henderson was to be given control.

Under that rule it cannot matter that the additional item of the observation of the pistol case followed so closely the statement Mrs. Henderson was under arrest, if that added factor were necessary to establish probable cause, so long as the seeing of the pistol case preceded the search.

### The Removal of Mrs. Henderson's Jewelry at the Jail Was Not an Illegal Seizure

The contention made in that respect merely urges the arrest was made without probable cause. Since we hold the trial court correctly held probable cause to exist, the contention is unsupported.

The petitions as to each of the petitioners are denied; the orders to show cause are dismissed.

Coughlin, Acting P. J., and Ault, J., concurred.

Petitioners' application for a hearing by the Supreme Court was denied July 16, 1970.